COLLEGE SAVINGS BANK, Plaintiff,

and

United States of America,
Intervenor–Plaintiff,

v.

FLORIDA PREPAID POSTSECONDARY
EDUCATION EXPENSE BOARD,
Defendant.

Civ. Nos. 95–4516 (GEB), 94–5610 (GEB).

United States District Court,
D. New Jersey.

Dec. 13, 1996.

Arnold B. Calmann, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, Kevin J. Culligan, Steven C. Cherny, Robert W. Morris and Mitchell S. Bompey, Fish & Neave, New York City, for plaintiff College Savings Bank.

Robert G. Shepherd, Mathews, Woodbridge & Collins, Princeton, NJ, Anne E. Hendricks, Eckert, Seamans, Cherin & Mellott, Marlton, NJ, for defendant Florida Prepaid Postsecondary Education Expense Board.

W. Scott Simpson, U.S. Department of Justice, Civil Division, Washington, DC, for intervenor-plaintiff U.S.

## MEMORANDUM OPINION

GARRETT E. BROWN, Jr., District Judge.

This matter comes before the Court on the motions of defendant, Florida Prepaid Postsecondary Education Expense Board, to dismiss plaintiff's Patent Act Claim (Civ. No. 94–5610) and Lanham Act Claim (Civ. No. 95–4516) pursuant to FED.R.CIV.P. 12(h)(3). For the reasons set forth herein, the Court will grant defendant's motion to dismiss the Lanham Act Claim and deny defendant's motion to dismiss the Patent Act Claim.

## I. BACKGROUND

### A. The Parties

Plaintiff College Savings Bank ("CSB") is a New Jersey chartered savings bank located in Princeton, New Jersey. CSB alleges that since September, 1987, it has engaged in the business of selling CollegeSure® CD, a deposit contract administered according to a patented method and intended to provide a return adequate to satisfy college education expenses, even though those expenses are presently unknown.[1] *See* Patent Act Compl. ¶ 3.

Defendant Florida Prepaid Postsecondary Expense Board ("Florida Prepaid") is a body corporate of the State of Florida, created by FLA.STAT. § 240.551 to manage and operate the Florida Prepaid Postsecondary Education Expense Program (the "Program").[2]

---

1. U.S. Patent No. 4,722,055 ("the '055 patent") was granted to CSB on January 26, 1988. The '055 patent, entitled "Methods and Apparatus for Funding Liability of Uncertain Costs," provides a method "for implementing an insurance investment program which provides an investor a future return adequate to pay the cost of a college education for his beneficiary (*e.g.*, a child, grandchild, etc.) in return for a present investment determined on the basis of current college cost data and projections of the rate of increase of college costs." *See* The '055 Patent—Summary of the Invention, attached to Plaintiff's Patent Act Complaint as Exh. A.

2. The Program is open to "qualified beneficiaries," defined to be:

Like CSB, Florida Prepaid agrees to provide a return for the money invested that is guaranteed to be adequate to meet payouts required to fund the uncertain cost of a college education at specified dates in the future.[3] Florida Prepaid has administered a tuition prepayment program since September, 1988.

### B. The Claims

#### 1. The Patent Act Claim

On November 7, 1994, CSB brought an action against Florida Prepaid for allegedly infringing CSB's '055 patent. Specifically, CSB avers, in pertinent part, that:

6. Defendant Florida Prepaid has been and still is directly infringing, actively inducing the infringement of, or contributing to the infringement of, the '055 patent by making, using, or selling in this Judicial District and elsewhere, contracts administered in accordance with a method to provide a return adequate to meet payouts for funding the uncertain cost of a college education at a future date.

7. Defendant Florida Prepaid with actual knowledge of the '055 patent, with knowledge of its infringement, and without lawful justification, has willfully infringed the '055 patent.

Patent Act Compl. ¶¶ 6–7. Thus, CSB contends that the manner in which Florida Prepaid performs its obligations under its college prepayment contracts—that is, the data processing apparatus and methods that Florida Prepaid uses—directly infringes CSB's patent under 35 U.S.C. § 271.

#### 2. The Lanham Act Claim

On August 25, 1995, CSB filed a complaint against Florida Prepaid alleging violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the common law tort of unfair

competition. CSB asserts that its efforts to sell investment contracts have been hurt by "false and misleading claims that Florida Prepaid has made in its promotional materials." Lanham Act Compl. ¶ 11. Specifically, CSB alleges that defendant falsely represented the Florida Prepaid program in the following respects: (1) that the State of Florida guarantees all contract beneficiaries to have the full amount necessary to fund a college education at a participating college or university, *id.* ¶ 14; (2) that any tax liability on a Florida Prepaid contract is deferred until the student reaps the benefits of the contract, *i.e.*, is enrolled at college, *id.* ¶ 22; (3) that Florida Prepaid's investments are backed by the "full faith and credit" of the United States, *id.* ¶¶ 30–32; and (4) that defendant failed to disclose, in its 1995 Annual Report, the existence of CSB's patent infringement action against it. *Id.* ¶¶ 37–39.

#### 3. The Counterclaims

In response to CSB's Patent Act Claim, Defendant filed a counterclaim seeking a declaration from this Court that CSB's '055 patent is invalid, unenforceable and void. Moreover, with respect to plaintiff's Lanham Act Claim, defendant filed counterclaims alleging defamation, product disparagement and trade libel. These counterclaims are centered on a statement made by Peter Roberts, the President and Chief Financial Officer of CSB, as quoted and printed in the September 13, 1995 edition of the Miami Daily Business Review, shortly after CSB filed the Lanham Act Claim. Commenting on the representations Florida Prepaid makes in the promotion of its deposit contract program, Mr. Roberts stated: "At best those claims are half-truths, and at worst they're outright lies." *See* Stan Yabaro, *Prepaid College Plan Faces New Suit from Rival*, MIAMI

---

(1) a resident of Florida at the time a purchaser enters into an advance payment contract on behalf of the resident;
(2) a non-resident who is the child of a non-custodial parent who is a resident of Florida at the time such parent enters into an advance payment contract on behalf of the child; or
(3) a graduate of an accredited high school in Florida who is a resident of Florida at the time he/she is designated to receive the benefits of the advance payment contract.
FLA.STAT. § 240.551(2)(e)(1)–(3).

3. Tuition for Florida State postsecondary education institutions is controlled by the Florida Legislature. Pursuant to FLA.STAT. § 240.209 and § 240.35, tuition is set by the State Board of Regents or the State Board of Community Colleges. *See* Declaration of William W. Montjoy ¶ 28, submitted in support of Florida Prepaid's Motion to Dismiss Plaintiff's Patent Act and Lanham Act Claims ("Montjoy Decl.").

DAILY BUS. REV., Sept. 13, 1995, at A1, A7, attached to Florida's Prepaid's Lanham Act Answer, Affirmative Defenses and Counterclaims as Exh. C.

## C. Procedural History

On March 23, 1995, Florida Prepaid filed a motion to dismiss the Patent Act Claim or, in the alternative, to transfer the action to the Northern District of Florida. Defendant alleged that CSB's Patent Act Claim failed to state a claim for patent infringement because there was no allegation that defendant was actually using or selling the method patented by CSB. *See* Florida Prepaid's Brief in Support of its Motion to Dismiss or Transfer Venue at 5. Therefore, defendant argued, the Patent Act Claim should be dismissed pursuant to FED.R.CIV.P. 12(b)(6). In the alternative, Florida Prepaid argued that the patent action should be transferred to the Northern District of Florida in view of *forum non-conveniens* issues. *Id.* at 7.

On May 4, 1995, this Court denied defendant's motions. Specifically, we found that

the complaint, as reasonably read, alleges the defendant has infringed the '055 patent by using the methods and apparatus patented therein to fulfill its obligation to purchasers of the contract. That easily satisfies the standard articulated in Rule 8(a).

Paragraph 6 of the complaint alleges the defendant is infringing the patent by selling contracts performed and effectuated by use of the claims of the '055 patent. While one could interpret the paragraph as complaining of the sale of contracts, it also clearly alleges that the defendant, to perform its obligations under the contract, utilized the methods covered by the '055 patent. In this regard, it is useful to remember that a contract is a promise or set of promises for the breach of which the law gives a remedy or the performance of which the law, in some way, recognizes as a duty.

The bargained for exchange here is that the defendant's contracts allegedly memorialize that in return for the purchaser's investment, Florida Prepaid will somehow provide a return sufficient to satisfy the

presently unknown financial liabilities of a college education. Inherent in that allegation, is that the defendant necessarily employs the methods covered by the '055 patent to fulfill its performance. The complaint recognizes this in paragraph 6, as evidenced by its own terms, and its close tracking of the claims of the '055 patent. I will deny the motion to dismiss.

*See* May 4, 1995 Transcript of Motion at 8–9, *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, Civ. No. 94–5610 (D.N.J. May 4, 1995) (GEB). Moreover, the Court was unpersuaded by defendant's *forum non conveniens* argument because, *inter alia:* (1) the defendant maintained significant contacts with New Jersey; (2) the median trial time at the time of the motion was significantly longer in the Northern District of Florida than in the District of New Jersey; and (3) most of Florida Prepaid's third-party agents who sell contracts and conduct other activities reside outside of Florida. *Id.* at 17–19. An Order denying defendant's motions was entered on May 5, 1995.

More than eight months later, on February 9, 1996, CSB filed a motion to dismiss Florida Prepaid's counterclaims for defamation, product disparagement and trade libel. CSB argued that Florida Prepaid, as a state agency, could not maintain an action for libel or defamation based on statements critical of government operations because such speech is protected by the Free Speech Clause of the First Amendment to the United States Constitution. *See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 919 F.Supp. 756, 758 (D.N.J.1996) (GEB) (*"College Savings I"*). CSB also contended that Roberts's statement was privileged speech because it commented on a judicial proceeding or a matter that is of public interest. *Id.*

By Memorandum Opinion and Order dated March 22, 1996, this Court granted plaintiff's motion to dismiss defendant's Lanham Act counterclaims after concluding that a government agency, such as Florida Prepaid, could not maintain an action for libel or defamation, regardless of whether that agency is acting in a proprietary capacity. *Id.* at 760.

We also noted that "[a] contrary holding would leave open the possibility that a government agency could file a civil action alleging defamation with malice, and thereby employ its potentially vast resources to chill speech in any number of contexts and regardless of the speaker's actual intent." *Id.* (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 297, 84 S.Ct. 710, 735, 11 L.Ed.2d 686 (1964) (Black, J., concurring)). Finally, this Court determined that the common law distinction between product disparagement and trade libel on the one hand, and defamation on the other hand, was irrelevant for purposes of plaintiff's motion because Roberts's statement addressed a matter of public concern. *Id.* at 761–63.

### D. Statutory History

Florida Prepaid challenges the constitutionality of certain provisions of the Patent Act and the Lanham Act. The Patent Act, first enacted in 1790, grants and protects an inventor's right of exclusion for a certain period. *See* Act of April 10, 1790, ch. VII, 1 Stat. 109; *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 480, 94 S.Ct. 1879, 1885–86, 40 L.Ed.2d 315 (1974). The Lanham Act was enacted in 1946. *See* Act of July 5, 1946, ch. 540, 60 Stat. 427. It is intended, among other things, to protect those engaged in commerce against unfair competition. *See* 15 U.S.C. § 1127.

In 1992, the Congress enacted amendments to the Patent Act and the Lanham Act to make clear that state governmental entities must abide by these statutes. *See* Patent and Plant Variety Protection Remedy Clarification Act, Pub.L. No. 102–560, 106 Stat. 4230 (1992); Trademark Remedy Clarification Act, Pub.L. No. 102–542, 106 Stat. 3567 (1992). Both enactments provide that no state or state instrumentality is immune from suit under the Eleventh Amendment for violations of these statutes. *See* Pub.L. No. 102–560, § 2(a)(2), 106 Stat. at 4230 (codified at 35 U.S.C. § 296(a)); Pub.L. No. 102–542, § 3(b), 106 Stat. at 3567 (codified at 15 U.S.C. § 1122(a)).

The 1992 amendments were considered necessary because of *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), which held that congressional intent to abrogate state immunity must be explicitly and unambiguously stated in the statute itself, *see id.* at 246, 105 S.Ct. at 3149—and because of later decisions that relied on *Atascadero. See* S.Rep. No. 102–280, 102d Cong., 2d Sess. 4–7 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3087, 3090–93. The Congress noted that, under those court decisions, the protection afforded by the Patent Act and the Lanham Act "depend[ed] on the status of the infringed party"—that is, whether the party was a state actor. *See id.* at 9. The amendments were enacted to eliminate this "inherent inequity" and to provide "uniform protection" to patent holders and competitors. *See id.* at 7, 9.

### E. The *Seminole Tribe* Decision

In 1992, the State of Florida was sued in federal court for violating the Indian Gaming Regulatory Act ("IGRA"), Pub.L. No. 100–497, 102 Stat. 2467 (1988). *Seminole Tribe of Florida v. Florida,* 801 F.Supp. 655, 656 (S.D.Fla.1992), *rev'd,* 11 F.3d 1016 (11th Cir. 1994), *aff'd,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Under IGRA, which was passed pursuant to the Indian Commerce Clause, art. I, § 8, cl. 3 of the Constitution, an Indian tribe may sue the state in federal court if the state refused to negotiate in good faith with the tribe over the establishment of a "compact" to permit gaming on the reservation. 25 U.S.C. § 2710(d)(7). Florida and its individually named governor moved to dismiss the action for lack of subject matter jurisdiction, challenging the constitutionality of the Act under the Eleventh Amendment.

Following a denial of that motion by the district court, the Eleventh Circuit reversed, holding that the Indian Commerce Clause did not grant Congress the authority to abrogate sovereign immunity.[4] *Seminole Tribe*

---

4. The Eleventh Circuit rejected the plaintiff's assertion that IGRA was passed not only pursuant to the Indian Commerce Clause, but also pursuant to Section 5 of the Fourteenth Amendment

and the Commerce Clause. 11 F.3d at 1025. Specifically, the court found that "IGRA does not create an entitlement to operate gambling operations; rather, it establishes the process and stan-

*of Florida v. Florida,* 11 F.3d at 1016, 1025–28 (11th Cir.1994), *aff'd,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). That court further held that the doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), did not authorize suit against the governor in his individual capacity. *Id.* at 1029.

The Supreme Court granted certiorari in order to consider: (1) whether the Eleventh Amendment prevents Congress from authorizing suits by Indian tribes against States for prospective injunctive relief to enforce legislation enacted pursuant to the Indian Commerce Clause; and (2) whether the doctrine of *Ex Parte Young* allows suits against the state's governor for prospective injunctive relief to enforce provisions of the statute. —— U.S. at ——, 116 S.Ct. at 1122. In a majority decision written by Chief Justice Rehnquist, and joined by Justices O'Connor, Scalia, Kennedy and Thomas, the Supreme Court affirmed the Eleventh Circuit's dismissal of the petitioner's suit, holding that despite Congress's clear intent to abrogate sovereign immunity as evidenced by the language of the statute itself, the Indian Commerce Clause does not grant Congress the power to abrogate a state's immunity without its consent.[5] *Id.* at —— —— ——, 116 S.Ct. at 1131–32.

In reaching this conclusion, the *Seminole Tribe* majority noted that two questions must be answered to determine if Congress has abrogated the states' immunity from suit: "first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' and second, whether Congress has acted 'pursuant to a valid exercise of power.' " *Id.* at ——, 116 S.Ct. at 1123. The Court indicated that it was "unmistakably clear" that Congress intended to abrogate Eleventh Amendment immunity in enacting IGRA.[6] *Id.* at ——, 116 S.Ct. at 1124. With respect to the second prong of the analysis, however, the Court concluded that Congress had no power to abrogate Eleventh Amendment immunity under the Indian Commerce Clause. *Id.* at ——, 116 S.Ct. at 1130. The Court noted that authority to abrogate had been found under only two constitutional provisions in prior decisions: the Fourteenth Amendment, *see Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), and the Interstate Commerce Clause, *see Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). *Id.* —— U.S. at ——, 116 S.Ct. at 1124–25. The *Seminole Tribe* Court determined that the plurality decision in *Union Gas* should be overruled because it was wrongly decided.[7]

5. The Court also ruled that the doctrine of *Ex parte Young* could not be used to enforce the Act against a state official such as the governor. *Id.* —— U.S. at ——, 116 S.Ct. at 1133. Specifically, the Court held that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young.*" *Id.* at ——, 116 S.Ct. at 1132. Because Congress, in enacting IGRA, "chose to impose upon the State a liability which is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young,*" the Court found that *Ex parte Young* was inapplicable. *Id.* at ——, 116 S.Ct. at 1133.

dards by which gambling may be conducted on Indian lands. Thus, IGRA creates no liberty or property interests and cannot implicate the Fourteenth Amendment." *Id.* The court also excluded the possibility that Congress enacted IGRA under the Interstate Commerce Clause. *Id.* at 1026 ("In analyzing Congress' goals, it is clear that alleviating a supposed burden on interstate commerce was not among them.").

6. The petitioner in *Seminole Tribe* did not challenge the Eleventh Circuit's conclusion that IGRA was not passed pursuant to the Fourteenth Amendment or the Interstate Commerce Clause.

7. The *Seminole Tribe* Court reasoned that when *Union Gas* was decided, the Eleventh Amendment already was well understood to limit the federal courts' jurisdiction under Article III. In overruling *Union Gas,* the Court

reconfirm[ed] that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian Commerce, that is under the exclusive control of the Federal Government. Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States. The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction. —— U.S. at —— —— ——, 116 S.Ct. at 1131–32.

*Id.* at —— – ——, 116 S.Ct. at 1128–29. Accordingly, the Court concluded that the Indian Commerce Clause, which is indistinguishable from the Interstate Commerce Clause for purposes of abrogation, did not allow Congress to strip the states of their Eleventh Amendment immunity in the enactment of IGRA. *Id.* at —— – ——, 116 S.Ct. at 1131–32.

### F. The Present Motions

Less than two months after the United States Supreme Court announced its decision in *Seminole Tribe,* Florida Prepaid filed the instant motions to dismiss CSB's Patent Act Claim and Lanham Act Claim. Essentially, Florida Prepaid asserts that CSB's claims must fail because: (1) to the extent that Congress amended the statutes in question pursuant to one or more of its Article I powers, such amendments are unconstitutional in the wake of *Seminole Tribe;* and (2) to the extent that Congress amended the statutes in question pursuant to Section 5 of the Fourteenth Amendment, these amendments are not "appropriate legislation" because they are not aimed at remedying the types of actions expressly prohibited by the Fourteenth Amendment's substantive provisions.

This Court certified Florida Prepaid's constitutional challenges to the Attorney General under 28 U.S.C. § 2403(a) and Rule 32A of the General Rules of the District of New Jersey. Upon request of the Department of Justice, the Court filed Orders on July 30 and August 2, 1996, making the United States an Intervenor in these actions.

In response to Florida Prepaid's motions, both CSB and the Intervenor assert that: (1) Florida Prepaid has waived any Eleventh Amendment immunity it may have been entitled to by engaging in the interstate marketing and administration of its investment contracts after Congress indicated that such activity would subject it to suit in federal court (*i.e.,* the doctrine of constructive waiver set forth in *Parden v. Terminal Ry. of Ala. State Docks Dep't,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964)); and (2)

the 1992 amendment to the Patent Act is a valid exercise of federal authority under Section 5 of the Fourteenth Amendment, thereby abrogating the states' Eleventh Amendment immunity from suit under that statute.

In addition, CSB has raised—and the Intervenor has expressly declined to take a position with respect to—the following arguments: (1) Florida Prepaid is not an "alter ego" or "arm of the state" of Florida and, therefore, is not entitled to Eleventh Amendment immunity; and (2) even assuming that Florida Prepaid is entitled to sovereign immunity, (a) defendant has waived its immunity through its actions in these lawsuits; and (b) the 1992 amendment to the Lanham Act is a valid exercise of federal authority under Section 5 of the Fourteenth Amendment, thereby abrogating the states' Eleventh Amendment immunity from suit under that statute.[8]

## II. DISCUSSION

### A. STANDARD FOR A MOTION TO DISMISS

Rule 12(b)(1) concerns a federal court's "lack of jurisdiction over the subject matter." FED.R.CIV.P. 12(b)(1). Because "[f]ederal courts are courts of limited jurisdiction," they have power to adjudicate "only those cases within the bounds of Article III and the United States Constitution and Congressional enactments stemming therefrom." *Walsh v. McGee,* 899 F.Supp. 1232, 1236 (S.D.N.Y. 1995) (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 173–80, 2 L.Ed. 60 (1803); *W.G. v. Senatore,* 18 F.3d 60, 64 (2d Cir.1994)). The question of subject matter jurisdiction is so fundamental that it is a "question the court is bound to ask and answer for itself, even when not otherwise suggested. . . ." *Mansfield, Coldwater & Lake Michigan Ry. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884). Thus, there is no restriction on who may make a motion pursuant to Rule 12(b)(1), or when such motion may be made. *See* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350, at 200 (2d ed.1990). In fact, Rule 12(h)(3) specifically provides that

**8.** The Intervenor has also declined to take any position with respect to the substantive merits of

either plaintiff's Patent Act Claim or Lanham Act Claim. *See* Intervenor Brief at 3 n. 1.

"[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."[9] The burden of proving that a federal court has subject matter jurisdiction over a given action rests with the party attempting to invoke the court's jurisdiction. *Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942); *see generally* 13 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3522, at 60–64 (2d ed.1984). If a case is dismissed for lack of subject matter jurisdiction, all other matters are moot. *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

### B. ARM OF THE STATE DOCTRINE

CSB first contends that the constitutional issues in this case need not be reached because Florida Prepaid is not the "alter ego" or "arm of the state" of Florida and, therefore, is not even entitled to Eleventh Amendment immunity. In response, Florida Prepaid counters that: (1) CSB is judicially estopped from arguing that Florida Prepaid is not an arm of the state for purposes of the pending motions because it previously argued in *College Savings I* that a state agency, such as Florida Prepaid, is barred as a matter of law from maintaining counterclaims for defamation, product disparagement and trade libel, *see* Florida Prepaid's Lanham Act Brief at 10; (2) CSB is barred by the law of the case doctrine from arguing that Florida Prepaid is not an arm of the state because this Court previously dismissed Florida Prepaid's counterclaims after finding that Florida Prepaid was a state agency, *see id.;* and (3) Florida Prepaid has satisfied its burden under *Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 340, 133 L.Ed.2d 238 (1995), of demonstrating that it is an arm of the State of

Florida. *Id.* at 5–10. These claims will be addressed *seriatim.*

#### 1. Judicial Estoppel

The doctrine of judicial estoppel "serves a consistently clear and undisputed jurisprudential purpose: to protect the integrity of the courts." *McNemar v. Disney Store, Inc.,* 91 F.3d 610, 616 (3d Cir.1996). This doctrine, which "is an equitable doctrine invoked by a court at its discretion," *id.* at 617 (quotation omitted), precludes a party from assuming a position in a legal proceeding that contradicts or is inconsistent with a previously asserted position. *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 358 (3d Cir.1996); *Delgrosso v. Spang & Co.,* 903 F.2d 234, 241 (3d Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 428, 112 L.Ed.2d 412 (1990); *Scarano v. Central R.R. Co. of N.J.,* 203 F.2d 510, 513 (3d Cir.1953); 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4477 (1981 & Supp.1996). While judicial estoppel is not intended to eliminate all inconsistencies, regardless of how slight or inadvertent, it is designed to prevent litigants from "playing 'fast and loose with the courts.'" *Ryan Operations,* 81 F.3d at 358 (quoting *Scarano,* 203 F.2d at 513). To permit a party to assume a position inconsistent with a position it had successfully relied upon in a past proceeding "would most flagrantly exemplify ... playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate." *Delgrosso,* 903 F.2d at 241 (quoting *Scarano,* 203 F.2d at 513); *see id.* at 242 (noting that the "application of the doctrine of judicial estoppel is particularly appropriate in situations ... where the party benefitted from its original position.").

■ To determine whether the doctrine of judicial estoppel applies to the particular facts and circumstances of a position, a court must engage in a two-part threshold inquiry:

---

**9.** Rule 12(h)(3) provides: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." The distinction between a Rule 12(h)(3) motion and a Rule 12(b)(1) motion "is simply that the former may be asserted at any time and need not be responsive to any pleading of the other party." *Berkshire Fashions, Inc. v. M.V. Hakusan II,* 954 F.2d 874, 879 n. 3 (3d Cir.1992). For purposes of this case, the motions are analytically identical because the only consideration is whether subject matter jurisdiction arises. *See id.*

"(1) Is the party's present position inconsistent with a position formerly asserted? (2) If so, did the party assert either or both of the inconsistent positions in bad faith—*i.e.,* 'with intent to play fact and loose with the court?' " *McNemar,* 91 F.3d at 618 (citing *Ryan Operations,* 81 F.3d at 361). Only if both prongs are satisfied is judicial estoppel an appropriate remedy. *Ryan Operations,* 81 F.3d at 361.

■ While at first blush it may appear as though CSB has asserted inconsistent positions regarding Florida Prepaid's status as an arm of the state, closer examination reveals that the issue of whether a state agency may bring an action for defamation, product disparagement or trade libel against a private competitor does not resolve whether that same state agency is entitled to Eleventh Amendment immunity. Indeed, the City of Chicago itself, whose suit against the Chicago Tribune occasioned the clear enunciation of the doctrine that no government entity can maintain actions for defamation, *see City of Chicago v. Tribune Co.,* 307 Ill. 595, 139 N.E. 86 (1923), has been found not to be entitled to immunity under the Eleventh Amendment.[10] *N.M. Paterson & Sons, Ltd. v. City of Chicago,* 176 F.Supp. 323, 324 (N.D.Ill.1959). Accordingly, the Court finds that judicial estoppel is inappropriate under these circumstances.

## 2. Law of the Case

The law of the case doctrine was developed "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Casey v. Planned Parenthood of Southeastern Pa.,* 14 F.3d 848 (3d Cir.1994) (quoting 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL RULES AND PRACTICE PROCEDURE § 4478 (1981)). The doctrine of the law of the case dictates that "when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation." *Deisler v. McCormack Aggregates Co.,* 54

F.3d 1074, 1086 (3d Cir.1995); *Resyn Corp. v. United States,* 945 F.2d 1279, 1281 (3d Cir.1991) (quoting *Devex Corp. v. General Motors Corp.,* 857 F.2d 197, 199 (3d Cir. 1988), *cert. denied sub nom. Technograph Liquidating Trust v. General Motors Corp.,* 489 U.S. 1015, 109 S.Ct. 1128, 103 L.Ed.2d 190 (1989)). Law of the case rules apply "both to issues expressly decided by a court in prior rulings and to issues decided by necessary implication." *Bolden v. Southeastern Pa. Transp. Auth.,* 21 F.3d 29, 31 (3d Cir.1994) (citing *Doe v. New York City Dep't of Social Servs.,* 709 F.2d 782 (2d Cir.), *cert. denied sub nom. Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983)). The law of the case doctrine merely "directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Bloom v. Consolidated Rail Corp.,* 812 F.Supp. 553, 556 (E.D.Pa.1993), *rev'd on other grounds,* 41 F.3d 911 (3d Cir.1994). It is axiomatic that "the doctrine of the law of the case comes into play only with respect to issues previously determined." *Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1149 n. 18, 59 L.Ed.2d 358 (1979).

■ As noted above, this Court's ruling that Florida Prepaid could not maintain an action for defamation, product disparagement or trade libel against CSB was not dispositive of the issue of whether that same state agency is entitled to Eleventh Amendment immunity. Nor was this issue decided by implication. Therefore, because *College Savings I* did not reach the issue of whether Florida Prepaid is an alter ego or arm of the State of Florida, we conclude that the doctrine of the law of the case is inapplicable to the case at bar and does not preclude this Court from considering the merits of CSB's argument that Florida Prepaid is not entitled to Eleventh Amendment immunity.

## 3. Arm of the State Doctrine

The Eleventh Amendment to the Constitution provides: "The Judicial power of the

---

**10.** Of course, the same would hold true for any city or county because Eleventh Amendment immunity does not extend to these entities. *See, e.g., Mt. Healthy City Sch. Bd. of Educ. v. Doyle,*

429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890).

United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. This provision divests the federal courts of the power to entertain a suit brought by a private party against a state unless either the state consents or Congress authorizes the action. *Port Authority Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L.Ed.2d 264 (1990); *Ford Motor Co. v. Dep't of Treasury of the State of Ind.*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Hans v. Louisiana*, 134 U.S. 1, 15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890).

The Eleventh Amendment bars suits not only against the state itself, but also against a subdivision of the state if the state remains "the real party in interest." *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974); 13 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3524, at 140–45 (2d ed.1984) (Eleventh Amendment protects subdivisions of states such as penal institutions, highway departments, courts, most universities, and bar associations). The state is the real party in interest whenever " 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' " *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 908 n. 11, 79 L.Ed.2d 67 (1984) (quoting *Dugan v. Rank*, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)).

In an effort to formulate a test to determine whether Eleventh Amendment immunity extends to a particular entity, the Third Circuit has developed the following set of factors ("*Urbano* factors")[11]:

(1) whether, in the event the plaintiff prevails, the payment of the judgment would come from the state (this includes three considerations: whether the payment will come from the state's treasury, whether the agency has sufficient funds to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts); (2) the status of the agency under state law (this includes four considerations: how state law treats the agency generally, whether the agency is separately incorporated, whether the agency can sue and be sued in its own right, and whether it is immune from state taxation); and (3) what degree of autonomy the agency enjoys.

*Christy*, 54 F.3d at 1144–45 (citing *Peters v. Del. River Port Auth. of Pa. and N.J.*, 16 F.3d 1346, 1350 (3d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 62, 130 L.Ed.2d 20 (1994)); *see also Bolden v. Southeastern Pa. Transp. Auth.*, 953 F.2d 807, 816 (3d Cir. 1991) (*in banc*), *cert. denied*, 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992); *Fitchik*, 873 F.2d at 659. The party asserting Eleventh Amendment immunity bears the burden of proving entitlement to it. *Christy*, 54 F.3d at 1144. We turn now to this three-pronged inquiry.

### a. Funding

■ Although no single *Urbano* factor is dispositive, the "most important" is whether a judgment against the entity in question would be paid out of the state treasury. *Christy*, 54 F.3d at 1145 (citing *Fitchik*, 873 F.2d at 659). This special emphasis is supported by "the Eleventh Amendment's central goal: the prevention of federal court judgments that must be paid out of the State's treasury." *Id.* (citing *Fitchik*, 873 F.2d at 659–60). *See also Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, ——, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994) ("[P]revention of federal court judgments that must be paid out of a State's

---

11. In *Urbano v. Bd. of Managers of N.J. State Prison*, 415 F.2d 247, 251–52 (3d Cir.1969), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970), the court set forth nine factors for determining whether Eleventh Amendment immunity extended to a particular entity. Subse-

quently, however, these factors were divided into the present three general factors. *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir.), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989).

treasury" formed the "impetus" for the Eleventh Amendment); *id.* ("[T]he vast majority of Circuits have concluded that the state treasury factor is the most important factor to be considered and, in practice, have generally accorded this factor dispositive weight.").

Under Florida law, Florida Prepaid can "[i]nvest funds not required for immediate disbursement." FLA.STAT. § 240.551(5)(c)(5). Florida Prepaid may also "[h]old, buy, and sell any instruments, obligations, securities, and property determined appropriate by the board," *see* FLA.STAT. § 240.551(5)(c)(7), "[s]olicit and accept gifts, grants, loans, and other aids from any source," *see* FLA.STAT. § 240.551(5)(c)(12), and "[r]equire and collect administrative fees and charges in connection with any transaction and impose reasonable penalties, including default, for delinquent payments for entering into an advance payment contract on a fraudulent basis." FLA. STAT. § 240.551(5)(c)(13). Moreover, Florida Prepaid has the authority to increase contract prices as necessary to meet its costs. *See* 1995 Florida Prepaid College Program Brochure at 8, attached to Declaration of Deborah M. Lodge ("Lodge Decl.") as Exh. 7.

Using these powers, Florida Prepaid has amassed total assets of nearly $1.5 billion and a surplus in excess of $184 million as of June 30, 1995.[12] Moreover, it has done so without much, if any, support from the State of Florida. Indeed, Stanley Tate, Florida Prepaid's chairman, stated that: "Not one dime of tax money has been spent on this program." *See* Testimony of Stanley G. Tate, April 30, 1990, before the *Subcommittee on Labor, Health and Human Services, Education and Related Agencies,* 101st Cong., 2d Sess. at 2504, attached to Lodge Decl. as Exh. 3. In the same written testimony, Tate also explained that the program was started with a $600,000 loan from the State of Florida Department of Insurance, and that this loan was paid in full in 1989, "two full years ahead of schedule." *Id.*

Although these factors tend to show that defendant is self-sufficient in many respects,

Florida Prepaid is precluded by law from satisfying a judgment against it. Specifically, Florida law provides:

> Neither the state nor any of its agencies shall pay or be required to pay monetary damages under the judgment of any court except pursuant to an appropriation made by law. To enforce a judgment for monetary damages against the state or a state agency, the sole remedy of the judgment creditor, if there has not otherwise been an appropriation made by law to pay the judgment, is to petition the Legislature in accordance with its rules to seek an appropriation to pay the judgment.

FLA.STAT. § 11.066(3). Thus, the fact that Florida Prepaid may have more than ample funds to satisfy any judgment that may result from this action is completely irrelevant because Florida Prepaid, like all other state agencies in Florida, is barred by law from satisfying any judgment against it, regardless of amount. Accordingly, this factor weighs heavily in favor of finding that Florida Prepaid is an arm of the State of Florida.

Another factor that tends to weigh in favor of Florida Prepaid's claim that it is entitled to Eleventh Amendment immunity is the fact that, if the Trust Fund itself proves unable to meet its obligations, the State of Florida will pay the beneficiaries directly:

> The state shall agree to meet the obligations of the board to qualified beneficiaries if moneys in the fund fail to offset the obligations of the board. The Legislature shall appropriate to the Prepaid Postsecondary Education Expense Trust Fund the amount necessary to meet the obligations of the board to qualified beneficiaries.

FLA.STAT. § 240.551(9). Thus, any resulting depletion of the Trust Fund through litigation would likely trigger the obligation of the State to make payments to beneficiaries. Moreover, the State of Florida is ultimately responsible for covering certain debts of Florida Prepaid:

> In the event that the state determines the program to be financially infeasible,

---

12. The $184 million represents the present value amount by which "the expected value of assets exceeds the expected value of liabilities" as stated by Ernst & Young, Florida Prepaid's accounting firm. *See* 1996 Annual Report at 12–13, attached to Lodge Decl. as Exh. 4.

the state may discontinue the provision of the program. Any qualified beneficiary who has been accepted by and is enrolled or is within 5 years of enrollment ... shall be entitled to exercise the complete benefits for which he or she has contracted. All other contract holders shall receive a refund ... of the amount paid in and an additional amount in the nature of interest at a rate that corresponds, at a minimum, to the prevailing interest rates for savings accounts provided by banks and savings and loan associations.

*Id.* § 240.551(14). Therefore, while the parties argue over the importance of this obligation, *see* CSB's Lanham Act Brief at 15–16; Montjoy Decl. ¶¶ 23–26, it is undisputed that under certain circumstances, the State of Florida will cover Florida Prepaid's debts. Accordingly, the Court finds that this factor weighs heavily in favor of finding that Florida Prepaid is an arm of the state.

The existence of a moderate amount of insurance does not change this analysis. The Florida Casualty Insurance Risk Management Trust Fund is a self-insurance program created by the State of Florida for the purpose of insuring all state agencies and is administered by the Division of Risk Management of the Florida Department of Insurance. *See* Montjoy Decl. ¶¶ 15–20. Premiums paid into the Fund by state agencies come from a variety of sources, including state-appropriated funds. *See id.* ¶ 19. Coverage is limited to $100,000 per claimant and $200,000 for all claims arising out of the same transaction or occurrence. FLA.STAT. § 768.28. Thus, only the first $100,000 or $200,000 of any judgment(s) would be paid through insurance; the rest could be obtained only through direct legislative appropriation. Montjoy Decl. ¶ 21. Taken together, these provisions do not establish that the State of Florida has insulated itself from any potential liability that may arise from a claim against Florida Prepaid. Rather, these provisions tend to demonstrate that the State of Florida has found, as a matter of policy, that the legislature should not be burdened with petitions for such claims. Accordingly, the existence of insurance in this matter does not weigh against Florida Prepaid's claim that it is an arm of the state.

In addition, the Court is not persuaded by CSB's suggestion that the importance of FLA. STAT. § 11.066(3), which provides that any judgment against a state agency must be paid pursuant to an appropriation of the state legislature, should somehow be diminished because "[i]t was adopted solely to bolster sovereign immunity." CSB's Lanham Act Brief at 17 (citing *Arnold v. BLaST Intermediate Unit 17*, 843 F.2d 122 (3d Cir. 1988); *Gary W. v. State of La.*, 622 F.2d 804 (5th Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 193 (1981)). First, in both *Arnold* and *Gary W.*, the courts were faced with the issue of whether a state could, in effect, avoid paying a federal judgment by relying on its own law to frustrate execution. The federal courts quite properly refused to countenance such defiance. Moreover, neither case involved an Eleventh Amendment question, and neither case suggests that a court should ignore an applicable state-law payment provision before a judgment is rendered. Second, the Supreme Court has never indicated that a state acts inappropriately by structuring an agency so that it may enjoy the special constitutional protections of the States themselves. Indeed, in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, the Court found that such structuring was a factor weighing in favor of finding an agency to be an arm of the state. 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979).

In sum, the Court finds that the first factor, whether the source of payment for any judgment would come from the state, weighs heavily in favor of finding that Florida Prepaid is an alter ego of the State of Florida. Florida is obligated, under certain circumstances, to cover the obligations of Florida Prepaid. Moreover, while it is true that the legislature is not compelled to satisfy a judgment against Florida Prepaid, Florida Prepaid, like all other state agencies in the State of Florida, cannot satisfy this judgment itself. Clearly, the State of Florida should not be penalized with the loss of sovereign immunity for the way it had chosen to organize its government. Florida Prepaid operates in the same manner and is subject to the same restrictions as other Florida State agencies.

### b. Status at State Law

The second general factor we must consider in determining whether Florida Prepaid is an arm or alter ego of the State of Florida is the status of Florida Prepaid under Florida law. Our purpose here is to determine whether Florida law treats Florida Prepaid as an independent entity, or as a surrogate for the State. *See Fitchik*, 873 F.2d at 662.

Under Florida law, those entities entitled to sovereign immunity include "state agencies," which are defined as, *inter alia*, " 'corporations primarily acting as instrumentalities or agencies of the state.' " *Skoblow v. Ameri–Manage, Inc.*, 483 So.2d 809, 812 (Fla.App. 3d Dist.1986) (quoting FLA.STAT. § 768.28(2)), *aff'd sub nom. Spooner v. Dep't of Corrections*, 514 So.2d 1077 (Fla.1987), *cert. denied*, 491 U.S. 904, 109 S.Ct. 3184, 105 L.Ed.2d 693 (1989). In *Skoblow*, the court held that a private hospital management company was entitled to sovereign immunity as a "state agency" because it had contracted with the government to manage a state hospital. *Id.* at 811–12. It follows, therefore, that a full-time state agency such as Florida Prepaid can receive no less protection.

Several other factors also weigh in favor of finding Florida Prepaid an arm of the state. For example, monies in the Florida Prepaid Trust Fund are protected by law from the creditors of the owners or beneficiaries of advance tuition payment contracts. *See* FLA. STAT. § 222.22. Florida Prepaid also enjoys certain tort immunity under state law. *See* FLA.STAT. § 768.28. Further, all of Florida Prepaid's powers are derived from specific legislative grants. Indeed, state agencies in Florida have no inherent or common law powers. *Kizar v. Wittenberg*, 398 So.2d 1002, 1003 (Fla.App. 5th Dist.1981); *Florida ex rel. Greenberg v. Florida State Bd. of Dentistry*, 297 So.2d 628, 636 (Fla.App. 1st Dist.), *cert. dismissed*, 300 So.2d 900 (Fla. 1974). All Florida agencies, including Flori-

da Prepaid, have only those powers specifically granted to them by the legislature.

On the other hand, there are certain factors which tend to weigh against a finding of immunity. Specifically, Florida Prepaid: (1) has the ability to sue and be sued in its own name; (2) controls its own funds and the investment and income therefrom; (3) may enter into contracts in its own name; and (4) may invest funds. *See* CSB's Lanham Act Brief at 22 & n. 20.[13] However, the Supreme Court has found that at least two of these factors—the fact that an agency is a "body corporate" and that it could "sue or be sued"—have limited relevance in Eleventh Amendment cases. *Florida Dep't of Health & Rehabilitative Servs. v. Florida Nursing Home Ass'n*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam). Moreover, this Court has already determined that Florida Prepaid's ability to control funds, enter into contracts, and invest funds was relatively unimportant for the present analysis when compared with other statutory provisions under federal law. Accordingly, the Court finds that the second general factor also weighs in favor of a finding of immunity.

### c. Autonomy

The Prepaid Postsecondary Education Expense Board, which administers Florida Prepaid, is composed of four officers of the State of Florida: the Insurance Commissioner and Treasurer, the Comptroller, the Chancellor of the Board of Regents, and the Executive Director of the State Board of Community Colleges.[14] FLA.STAT. § 240.551(5). Three additional members are appointed by the Governor of Florida and confirmed by the State Senate. *Id.* The Governor also appoints the initial chairman of the board. *Id.* § 240.551(5)(a). State authority over the appointment of Board members "lends obvious support to a finding of sovereignty." *Christy*, 54 F.3d at 1149 (citing *Peters*, 16 F.3d at 1351–52). Moreover, in another plain limitation on autonomy, Florida Prepaid's ac-

---

13. CSB also alleges that Florida Prepaid is "separately incorporated," and therefore, this factor should weigh against immunity. However, Florida Prepaid is not separately incorporated; rather, it is a state agency that has also been created as a "body corporate" with certain corporate powers. FLA.STAT. § 240.551(5).

14. The Insurance Commissioner and Treasurer and the Comptroller are elected constitutional officers of the State of Florida. *See* FLA.CONST. art. IV, §§ 4(d), (e).

counts are "subject to annual audits by the Auditor General or his designee."[15] FLA.STAT. § 240.551(5)(g).

On the other hand, weighing in favor of a finding of autonomy are the facts that the Board itself "appoint[s] an executive director to serve as the chief administrative and operational officer of the board and to perform other duties assigned to him or her by the board," FLA.STAT. § 240.551(5)(b) and is authorized to "[c]ontract for necessary goods and services, employ necessary personnel, and engage the services of private consultants, actuaries, managers, legal counsel, and auditors for administrative or technical assistance." *Id.* § 240.551(5)(c)(11). Florida Prepaid also has the ability to "[e]stablish agreements or other transactions with federal, state, and local agencies, including state universities and community colleges," *id.* § 240.551(5)(c)(4), "[i]nvest funds not required for immediate disbursements," *id.* § 240.551(5)(c)(5), "[a]ppear on its own behalf before boards, commissions, or other governmental agencies," *id.* § 240.551(5)(c)(6), "[h]old, buy, and sell any instruments, obligations, securities, and property determined appropriate by the board," *id.* § 240.551(5)(c)(7), "[r]estrict the numbers of participants in the ... plan[s]," *id.* § 240.551(5)(c)(9), "[d]elineate the terms and conditions under which payments may be withdrawn from the fund and impose reasonable fees and charges for such withdrawal," *id.* § 240.551(5)(c)(16), and "[e]stablish other policies, procedures, and criteria to imple-

ment and administer the provisions of this section." *Id.* § 240.551(5)(c)(18).[16]

On balance, this factor weighs slightly in favor of immunity from suit in this case. *Cf. Peters,* 16 F.3d at 1351–52 (where separately incorporated agency was found to have power to enter contracts, hold property, and set and collect tolls, court held that the autonomy factor weighed "slightly" in favor of affording immunity in light of the states' power to appoint the members of the board of the agency in question). Further, we note that like all Florida state agencies, Florida Prepaid has only the powers and degree of independence necessary for it to carry out the tasks assigned to it by the State of Florida.

### d. Totality of the Factors

Having considered each of the three factors above, we now must consider the three factors in their totality. *See Bolden,* 953 F.2d at 821. Since the most important factor, funding, weighs heavily in favor of Florida Prepaid, and the other two factors also weigh at least slightly in favor of Florida Prepaid, the balance is clearly struck in favor of a finding that Florida Prepaid enjoys sovereign immunity as an arm of the State of Florida.

### C. WAIVER BY CONDUCT IN LITIGATION

■ CSB argues that, even if the Eleventh Amendment would otherwise apply and would undercut the jurisdiction of this Court, Florida Prepaid has waived this defense and has effectively consented to being sued here by "participating in this federal action and by

---

**15.** The Auditor General of Florida is an officer of the State of Florida appointed by the state legislature pursuant to Article III, section 2 of the Florida Constitution.

**16.** With respect to CSB's contention that Florida Prepaid is autonomous, in part, because its funds remain separate from other state funds at all times, *see* CSB's Lanham Act Brief at 24, we note that a similar argument was rejected by the court in *Michigan v. United States,* 40 F.3d 817 (6th Cir.1994). Specifically, the court noted:

It is likewise immaterial that the funds of the education trust, like the funds of many public corporations, authorities, and similar establishments, come primarily from persons to whom the entity provides a service—and it is immaterial that such funds are earmarked for the

benefit of those who receive the service. If the funds of the Postal Service come primarily from persons who buy stamps, the funds of the Tennessee Valley Authority from those who purchase power from that agency, and the funds of the Port of New York authority from users of the authority's bridges and tunnels, it does not mean that the Postal Service, the Tennessee Valley Authority, and the Port of New York Authority are anything other than governmental in character. Neither is the governmental character of these agencies compromised in any way by the fact that the agencies' funds are earmarked—like highway trust funds and countless other restricted accounts of governmental bodies—for use in performing the functions that the agencies were created by law to perform.
*Id.* at 829.

filing counterclaims in both the Lanham Act and patent actions." CSB's Lanham Act Brief at 9. According to CSB, Florida Prepaid

> has made more than a "general appearance" in this Court. Florida Prepaid has filed three counterclaims and has availed itself of the Court's jurisdiction in those matters. By virtue of its participation in this suit, Florida Prepaid thus has waived any Eleventh Amendment immunity it might have enjoyed.

*Id.* at 10 (citation omitted). Moreover, CSB seems to suggest that Florida Prepaid's failure to raise the Eleventh Amendment defense in its pleadings somehow precludes defendant from raising this defense at this time.

■ Plaintiff's arguments merit little discussion. To begin with, Florida Prepaid did not voluntarily enter into this litigation; instead, it was sued in this district despite conducting less than one percent of its business here. Thus, its motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6) or, in the alternative, to transfer the Patent Act Complaint to the Northern District of Florida pursuant to 28 U.S.C. § 1404, must be viewed as the response of a "beleaguered defendant," rather than an active participant. *See Unix Sys. Labs., Inc. v. Berkeley Software Design, Inc.,* 832 F.Supp. 790, 801 (D.N.J.1993); *see also Pennhurst State Sch. & Hosp.,* 465 U.S. at 99, 104 S.Ct. at 907 (stating that the waiver of a state's sovereign immunity, like the waiver of any constitutional right, must be construed in favor of the holder of the right). It is also clear that Florida Prepaid's counterclaims all involved matters that arose from, or were concerned with, matters in the underlying complaints. *See Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1512 (3d Cir.) (noting that it is well established that "filing a counterclaim does not waive an objection to jurisdiction."), *cert. granted in part,* — U.S. ——, 115 S.Ct. 634, 130 L.Ed.2d 539 (1994), *aff'd,* — U.S. ——, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *see also Bayou Steel Corp. v. M/V Amstelvoorn,* 809 F.2d 1147, 1148 (5th Cir.1987); *In re Arthur Treacher's Franchisee Litig.,*

92 F.R.D. 398, 413 (E.D.Pa.1981); *cf. Neifeld v. Steinberg,* 438 F.2d 423, 431 n. 17 (3d Cir.1971) (dicta). Finally, we note that this analysis is not changed by the fact that Florida Prepaid did not raise the Eleventh Amendment immunity defense in its answer. The Eleventh Amendment defense sufficiently "partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *Florida Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 683 n. 18, 102 S.Ct. 3304, 3314 n. 18, 73 L.Ed.2d 1057 (1982); *Edelman,* 415 U.S. at 678, 94 S.Ct. at 1363. Therefore, Florida Prepaid's failure to raise this defense at the outset does not preclude its application at this juncture.

### D. THE *PARDEN* DOCTRINE

Where a state consents to being sued, neither the Eleventh Amendment nor the doctrine of sovereign immunity is a bar. *See Petty v. Tennessee–Missouri Bridge Comm'n,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); *Clark v. Barnard,* 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883). In the absence of an express consent by a state to be sued, federal courts have still attempted to find some type of implied or constructive consent by the state to avoid the limitations of the Eleventh Amendment. Thus, in *Parden v. Terminal Ry. of Ala. State Docks Dep't,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), the Court found that the State of Alabama, by its conduct in operating a railroad, had consented to suit in federal court under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60. In *Parden,* employees brought a FELA personal injury suit for damages against an Alabama-owned interstate railroad. The Court first examined whether Congress had intended to include state-owned as well as privately-owned rail carriers under the coverage of FELA. Although there was no language in FELA specifically authorizing suits against a state, Congress had made FELA applicable to "every" interstate rail carrier, thus including the Alabama-owned railroad within its coverage.

After finding that the state-owned railroad was within the coverage of FELA, the Court

next examined whether Congress had the power to subject Alabama to suit in light of the State's sovereign immunity. Justice Brennan, writing for a five-member majority, found that by empowering Congress to regulate commerce, "the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation." 377 U.S. at 192, 84 S.Ct. at 1212. However, the majority opinion went on to explain that the Eleventh Amendment was not being overridden, since a state still could not be sued by an individual without its consent. The Court concluded that Alabama had consented to a suit under FELA by its continued operation of an interstate railroad for approximately twenty years after Congress had made such railroads subject to suit under FELA.

Four Justices disagreed as to the type of statutory notice that was necessary before Congress could make the states subject to suit through their implied consent.

It should not be easily inferred that Congress, in legislating pursuant to one article of the Constitution, intended to effect an automatic and compulsory waiver of rights arising out of another. Only when Congress has clearly considered the problem and expressly declared that any state which undertakes given regulable conduct will be deemed thereby to have waived its immunity should courts disallow the invocation of this defense.

... If the automatic consequence of state operation of a railroad in interstate commerce is to be waiver of sovereign immunity, Congress' failure to bring home to the State the precise nature of its option makes impossible the "intentional relinquishment or abandonment of a known right or privilege" which must be shown before constitutional rights may be taken to have been waived. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). *Id.* 377 U.S. at 198–200, 84 S.Ct. at 1216–1217 (White, J., dissenting). Despite the difference between the majority and dissenters regarding the need for express congressional authorization for suits against the state, the *Parden* Court recognized that where Congress under its commerce power had authorized private suits against a state engaging in certain conduct and the state continued that conduct, the state necessarily had consented to be sued.

Subsequently, in *Employees of the Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the dissenting position in *Parden* was adopted by a majority of the Court. The *Employees* case involved a suit against the State of Missouri to enforce the State's compliance with the Fair Labor Standards Act, which had been amended to apply to state and local governments. The majority distinguished *Parden* on the grounds that whereas states have a choice whether or not to operate railroads, they have little discretion in deciding whether to provide basic public services like public hospitals and police protection. In the absence of a clear declaration from Congress that it intended to make states liable for violations of the Act, the Court concluded, there is no basis for finding a constructive waiver. *Id.* at 285, 93 S.Ct. at 1618.

The Court's refusal to find constructive waivers became even clearer a year after the *Employees* decision in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In addition to trying to avoid the Eleventh Amendment by suing the state officers, the plaintiffs also claimed that Illinois had waived its immunity to suits over its welfare program by voluntarily choosing to receive federal funds. Under the Social Security Act, states are not obligated to participate in the program of Aid to the Aged, Blind and Disabled. If, however, a state decides to participate, it receives federal funds but must comply with federal standards. The Court said that there was not a sufficient declaration of Congress's desire to permit suits against states in federal courts when states choose to receive federal welfare monies. The Court concluded that the "mere fact that a State participates in a program through which the Federal Government provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the

State to be sued in the federal courts."[17] *Id.* at 673, 94 S.Ct. at 1360.

In 1987, the Supreme Court explicitly overruled its earlier decision in *Parden*. In *Welch v. Texas Dep't of Highways and Pub. Transp.*, the Court considered whether the Jones Act can be the basis for state liability in federal court. 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). The Jones Act is a federal statute creating remedies for injured seamen like those for injured railroad employees involved in the *Parden* case. Welch was injured while working for the State of Texas on the docks and sued to recover for his injuries.

The Supreme Court held that the Eleventh Amendment barred Welch's suit against Texas. The Court stated that "Congress has not expressed in unmistakable statutory language its intention to allow States to be sued in federal court under the Jones Act." *Id.* at 475, 107 S.Ct. at 2947. The Court emphasized that waiver will be found only if Congress clearly and unequivocally expresses its intent to make state liable. Moreover, the Court declared that *Parden* was overruled to the extent that it was inconsistent with its holding in *Welch*. *Id.* at 476, 107 S.Ct. at 2947.

In sum, the rarity of a state's constructive waiver of its Eleventh Amendment immunity cannot be overstated. *Edelman*, 415 U.S. at 653, 94 S.Ct. at 1351 ("Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights...."). Indeed, no Supreme Court decision except *Parden* itself, which was a five-four decision, has found that consent under the *Parden* theory.

■ With the foregoing as a backdrop, we conclude that the *Parden* doctrine cannot apply to eliminate Florida Prepaid's immunity under the Eleventh Amendment immunity because: (1) Florida Prepaid is essentially performing a role traditionally undertaken by state governments—making available afford-able educational opportunities; and (2) in the wake of *Seminole Tribe*, Congress may no longer utilize its Article I powers to elicit a waiver of sovereign immunity as a condition for participating in a field subject to congressional regulation.

1. Florida Prepaid's Important Governmental Function

The Supreme Court has recognized that "education is perhaps the most important function of state government." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). More recently, the Court reaffirmed that education is an area "where States historically have been sovereign." *United States v. Lopez*, —— U.S. ——, ——, 115 S.Ct. 1624, 1632, 131 L.Ed.2d 626 (1995). In *Lopez*, a case not involving the Eleventh Amendment, the Supreme Court struck down legislation founded on a sweeping interpretation of congressional power under the Interstate Commerce Clause. Clearly, education is uniquely important to the role of the states.

The Third Circuit also has acknowledged that providing education-related services is a core function of state government. In *Skehan v. State Sys. of Higher Educ.*, 815 F.2d 244 (3d Cir.1987), the court held that the Pennsylvania State System of Higher Education, "a body corporate and politic" created by state law to administer educational institutions, *id.* at 247, was a state agency entitled to claim immunity under the Eleventh Amendment. *See id.* at 249. In so doing, the court observed: "Providing education has long been recognized as a function of state government." *Id.* at 248.

Of course, in this case, Florida Prepaid's supporting (and necessary) role in this activity is not within the exclusive province of the states. Indeed, there can be no doubt that Florida Prepaid and CSB, among others, are competing against one another for college-earmarked dollars. However, the mere fact

17. The holding in *Edelman* has been reaffirmed and applied by the Court in rulings that a state does not waive its Eleventh Amendment immunity by receiving federal funds under the Rehabilitative Act of 1973, *see Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), or by agreeing to be bound by the requirements of the federal Medicaid Act. *Florida Dep't of Health & Rehabilitative Servs. v. Florida Nursing Home Ass'n*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981).

that Florida Prepaid and private businesses offering prepaid tuition plans are similar in certain respects is not dispositive here.[18] *Cf. Close v. State of N.Y.*, 1996 WL 481550, at *4 (N.D.N.Y. Aug. 19, 1996) (rejecting the notion that a state constructively consents to be sued by engaging in any area of activity that it does not exercise absolute control). Florida Prepaid was created by statute to perform a task found to be vital to the State of Florida:

> The Legislature recognizes that educational opportunity at the postsecondary level is a critical state interest. It further recognizes that educational opportunity is best ensured through the provision of postsecondary institutions that are geographically and financially accessible. Accordingly, it is the intent of the Legislature that a program be established through which many of the costs associated with postsecondary attendance may be paid in advance and fixed at a guaranteed level for the duration of undergraduate enrollment. It is similarly the intent of the Legislature to provide a program that fosters timely financial planning for postsecondary attendance and to encourage employer participation in such planning through program contributions on behalf of employees and the dependents of employees.

FLA.STAT.ANN. § 240.551(1). Certainly, providing a system to help people pay for the education of Florida citizens at Florida state universities and colleges is vital to Florida's attainment of its educational objectives in operating these institutions. Florida Prepaid provides a substantial benefit that directly and significantly promotes the educational objectives of the State of Florida. *See College Savings I*, 919 F.Supp. at 761 ("[W]hile Florida Prepaid purports to function in a proprietary capacity in administering the program, it nonetheless performs 'an essential government operation' that has affected hundreds of thousands of citizens, within and outside of Florida.") (footnote omitted).

Moreover, we note that Florida Prepaid does not offer "investment contracts" to the public. Essentially, Florida Prepaid is offering contracts for college tuition and dormitory facilities. Unlike the program offered by CSB, the prepayment program offered by Florida Prepaid does not produce investment income. *See* FLA.STAT. § 240.551(6)(e)(1). According to section 5.01 of the Florida Prepaid Master Covenant, "[t]his master covenant is not a debt instrument. Except for the circumstances in Paragraphs 5.02, 5.03 and 5.08, termination or default will entitle you [the purchaser] to a refund of the amount paid into the plan, minus reasonable administrative fees established by the Board. No interest will be refunded." Plainly, Florida Prepaid is not selling investment contracts, but rather highly specialized savings vehicles linked to the express purpose of providing financing for a higher education of Florida citizens at Florida schools:

> The State considers this an essential governmental operation to assist its citizens to access higher education. All legal and beneficial interests in the assets held by the trust fund are vested in the State for its exclusive benefit and the exclusive benefit of the colleges and universities; therefore, payments are guaranteed to be made on the beneficiary's behalf to the State

---

**18.** CSB impliedly suggests that the doctrine of judicial estoppel should bar Florida Prepaid from arguing that it is performing a core governmental function. *See* CSB's Reply Brief in Further Opposition to Defendant's Motions to Dismiss at 3 ("Florida Prepaid has acknowledged that this case involves a state's proprietary (as opposed to governmental) functions. Thus, Florida Prepaid's brief opposing [CSB's] motion to dismiss the libel counterclaims in the Lanham Act case, which the Court granted, bemoaned the state agency's vulnerability in this area...."). However, there is nothing necessarily inconsistent with Florida Prepaid arguing that while it operates its Program like a competitive business, the Program itself is aimed at satisfying a core gov-

ernmental function. Clearly, an aggressive marketing strategy or a desire for the Program to succeed does not transform an alter ego of the state into a private entity for purposes of Eleventh Amendment immunity. *See College Savings I*, 919 F.Supp. at 761 n. 3 ("That a statement embodies or addresses a commercial matter certainly does not preclude a court from finding that it falls within the realm of public concern.") (citing, for example, *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162–70, 87 S.Ct. 1975, 1995–99, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring)). Accordingly, Florida Prepaid is not judicially estopped from claiming that it performs a core governmental function.

college or university. Exercise of full benefits under the contract guarantees the beneficiary receipt of services and the beneficiary will not receive any funds.

Florida Prepaid Master Covenant § 5.08.

Based on the foregoing, the Court finds that Florida Prepaid is performing a role traditionally undertaken by state governments—making available affordable educational benefits. Therefore, the *Parden* doctrine, on its own terms, cannot apply to eliminate Florida Prepaid's immunity under the Eleventh Amendment.

2. *Parden* in the Wake of *Seminole Tribe*

Florida Prepaid argues in the alternative that, even assuming it is not engaged in "core governmental" activities, the doctrine of constructive waiver cannot survive the Supreme Court's recent decision in *Seminole Tribe of Florida v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) because the *Parden* doctrine presupposes that Congress has the authority pursuant to Article I of the Constitution to force a state to relinquish its Eleventh Amendment immunity as a condition of participating in a field subject to congressional regulation.[19] In order to address this contention, we turn first to the Supreme Court's decision in *Pennsylvania v. Union Gas*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), which was expressly overruled by *Seminole Tribe*.

In *Union Gas*, a sharply divided Supreme Court found that Congress had the authority to abrogate States' Eleventh Amendment immunity when it enacted the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). In the *Union Gas* plurality opinion, written by Justice Brennan, four members of the Court concluded that Congress has the authority to override States' immunity when legislating pursuant to the Interstate Commerce Clause. 491 U.S. at 19, 109 S.Ct. at 2284. In Part III of its opinion, the plurality reasoned from

language in *Parden* and *Employees* that "the power to regulate commerce includes the power to override States' immunity from suit...." *Id.* at 14–15, 109 S.Ct. at 2281.

The deciding vote on the constitutional issue was cast by Justice White, who was somewhat less than clear about exactly what his concurrence meant. Justice White spent several pages explaining in partial dissent why he did not believe the statute clearly expressed a Congressional intent to abrogate the State's immunity, a position joined by three other Justices. Then, in part II of his concurrence, he devoted one short paragraph to the constitutional issue, saying only that "I agree with the conclusion reached by Justice Brennan in Part III of his opinion, that Congress has the authority under Article I to abrogate the Eleventh Amendment immunity of the States, although I do not agree with much of his reasoning." *Id.* at 57, 109 S.Ct. at 2296 (White, J., concurring in the judgment in part and dissenting in part).

Justice Scalia cast the deciding vote on the statutory construction issue, agreeing with Brennan's plurality opinion that the Congressional language at issue was sufficiently clear to override a state's Eleventh Amendment immunity assuming the authority to do so. *Id.* at 29, 109 S.Ct. at 2289–90 (Scalia, J., concurring in part and dissenting in part). However, joined by three other Justices, he dissented as to Congress's authority to abrogate when legislating pursuant to the Commerce Clause, lamenting that "instead of cleaning up the muddled Eleventh Amendment jurisprudence produced by *Hans*, the Court leaves that in place, and adds to the clutter the astounding principle that Article III limitations can be overcome by simply exercising Article I powers." *Id.* at 44–45, 109 S.Ct. at 2304 (Scalia, J., concurring in part and dissenting in part).

Moreover, Justice Scalia, who formed part of the majority in *Seminole Tribe*,[20] argued that even viewing *Parden* as a waiver case could not save it from constitutional infirmity

---

19. Of course, it would make no sense for Congress to impose a *Parden*-type waiver pursuant to Section 5 of the Fourteenth Amendment because Congress could utilize this same source of legislative power to eliminate immunity, making a finding of waiver unnecessary.

20. This portion of Justice Scalia's opinion was joined by Chief Justice Rehnquist, Justice O'Connor, and Justice Kennedy.

under the analysis that eventually triumphed in *Seminole Tribe:*

It remains for me to consider whether the doctrine of waiver applies here.... *Parden* is the only case in which we have held that the Federal Government can demand, as a condition to its permission of state action regulable under the Commerce Clause, the waiver of state sovereign immunity. Two terms ago, in *Welch,* we overruled *Parden* insofar as that case spoke to the clarity of language necessary to constitute such a demand.... We explicitly declined to address, however, the continued validity of *Parden's* holding that the Commerce Clause provided the constitutional power to make such a demand.... I would drop the other shoe.

There are obvious and fatal difficulties in acknowledging such a power if no Commerce Clause power to abrogate state sovereign immunity exists. All congressional creations of private rights of action attach recovery to the defendant's commission of some act, or possession of some status, in a field where Congress has authority to regulate conduct. Thus, all federal prescriptions are, insofar as their prospective application is concerned, in a sense conditional, and—to the extent that the objects of the prescriptions consciously engage in the activity or hold the status that produces liability—can be redescribed as invitation to "waiver."... *At bottom, then, to acknowledge that the Federal Government can make the waiver of state sovereign immunity a condition to the State's action in a field that Congress has authority to regulate is substantially the same as acknowledging that the Federal Government can eliminate state sovereign immunity in the exercise of its Article I powers—that is, to adopt the very principle I have just rejected. There is little more than a verbal distinction between saying that Congress can make the Commonwealth of Pennsylvania liable to private parties for hazardous-waste cleanup costs on sites that the Commonwealth owns and operates, and saying the same thing but adding at the end "if the Commonwealth chooses to own and operate them." If*

*state sovereign immunity has any reality, it must mean more than this.*

*Id.* at 42–44, 109 S.Ct. at 2303–2304 (Scalia, J., concurring in part and dissenting in part) (emphasis added).

When *Union Gas* is read in light of *Seminole Tribe,* wherein the Supreme Court overruled the principle that Congress may abrogate Eleventh Amendment immunity pursuant to its Article I powers, *see Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1131, it is clear, by implication, that Congress may not employ its Article I powers to condition a state's participation in a particular market or industry on that state's waiver of its Eleventh Amendment immunity. *See id.* at ——, 116 S.Ct. at 1128 ("As the dissent in *Union Gas* recognized, the plurality's conclusion—that Congress could under Article I expand the scope of the federal courts' jurisdiction under Article III—'contradict[ed] our unvarying approach to Article III as setting forth the *exclusive* catalog of permissible federal court jurisdiction.'") (quoting *Union Gas,* 491 U.S. at 39, 109 S.Ct. at 2301) (Scalia, J., concurring in part and dissenting in part).

As the *Union Gas* Court noted, *Parden* was based on the conclusion that "the States surrendered a portion of their sovereignty when they granted Congress the power to regulate commerce," and that "[b]y empowering Congress to regulate commerce, ... the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation." 491 U.S. at 14, 109 S.Ct. at 2281 (quoting *Parden,* 377 U.S. at 191, 192, 84 S.Ct. at 1212, 1212–13). This theory of surrender, however, has been explicitly rejected by the Court in *Seminole Tribe.* Indeed, the *Seminole Tribe* Court stated, in no uncertain terms, that "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." —— U.S. at ——, 116 S.Ct. at 1131–32. It necessarily follows, therefore, that *Parden's* underpinnings are no longer viable. Congress cannot achieve indirectly, through "waiver," what it cannot do directly, through express abrogation. "If state sovereign im-

munity has any reality, it must mean more than this." *Union Gas,* 491 U.S. at 44, 109 S.Ct. at 2304 (Scalia, J., concurring in part and dissenting in part). Thus, we conclude that *Parden* has been overruled by implication by *Seminole Tribe* to the extent that *Parden* held that Congress, acting pursuant to the powers conferred upon it in Article I of the Constitution, may explicitly condition a state's participation in a particular market on its waiver of immunity from suit.[21] Accordingly, the *Parden* doctrine cannot apply to eliminate Florida Prepaid's immunity under the Eleventh Amendment.

### E. ABROGATION

Lastly, we consider the argument that Congress has abrogated the States' Eleventh Amendment immunity when amending the Patent Act and the Lanham Act. When determining whether Congress has abrogated the States' Eleventh Amendment immunity, we must conduct a two-part inquiry: "first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' and second, whether Congress has acted 'pursuant to a valid exercise of power.'" *Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1123 (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985)). Thus, we must consider each of these questions in turn.

### 1. Unequivocal Expression of Intent to Abrogate Immunity

"Congress' intent to abrogate the States' immunity from suit must be obvious from 'a clear legislative statement.'" *Id.* —— U.S. at ——, 116 S.Ct. at 1123 (quoting *Blatchford v. Native Village of Noatak and Circle Village,* 501 U.S. 775, 786, 111 S.Ct. 2578, 2584–85, 115 L.Ed.2d 686 (1991)). "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient

to abrogate the Eleventh Amendment." *Atascadero State Hosp.,* 473 U.S. at 246, 105 S.Ct. at 3149; *accord Blatchford,* 501 U.S. at 786 n. 4, 111 S.Ct. at 2585 n. 4 ("The fact that Congress grants jurisdiction to hear a claim does not suffice to show Congress has abrogated all defenses of that claim."). Thus, "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Dellmuth v. Muth,* 491 U.S. 223, 227–28, 109 S.Ct. 2397, 2400, 105 L.Ed.2d 181 (1989); *see also Welch,* 483 U.S. at 474, 107 S.Ct. at 2946.

### a. Abrogation of Immunity Under the Patent and Plant Variety Protection Remedy Clarification Act

The Patent and Plant Variety Protection Remedy Clarification Act, Pub.L. No. 102–560, 106 Stat. at 4230, which amended the Patent Act, provides:

Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person, including any governmental or non-governmental entity, for infringement of a patent ... or for any other violation under this title.

Pub.L. No. 102–560, § 2(a)(2), 106 Stat. at 4230 (codified at 35 U.S.C. § 296(a)). This language is even clearer than that which the Supreme Court recently found sufficient in *Seminole Tribe,* where the statute did not explicitly refer to the Eleventh Amendment. *See Seminole Tribe,* —— U.S. at —— — ——, 116 S.Ct. at 1123–24. Thus, the Patent Act provision challenged here is more than clear

---

**21.** The Government incorrectly asserts that "the Supreme Court has referred favorably to the waiver aspect of *Parden*" in *Seminole Tribe.* Intervenor's Brief at 9. The basis for this assertion is the rather offhand observation that *Parden* represents "the unremarkable ... proposition that the States may waive their sovereign immunity." *Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1128. However, when this comment is read in light of *Seminole Tribe's* holding that the

bounds of Article III may only be expanded by Congress when its enacts appropriate legislation pursuant to § 5 of the Fourteenth Amendment, it is clear that the Court's passing reference to *Parden* can only mean that actual, deliberate waiver by a state remains possible. The Court was careful not to endorse the mechanism for waiver created by *Parden,* that is, the congressional regulatory approach.

enough to abrogate the States' Eleventh Amendment immunity for suit thereunder in federal court. *See Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 941–42 (Fed.Cir. 1993) (finding that the current Patent Act is sufficiently clear to abrogate state immunity), *cert. denied sub. nom. Regents of Univ. of Cal. v. Genentech, Inc.,* 510 U.S. 1140, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994).

### b. Abrogation of Immunity Under the Trademark Remedy Clarification Act

The Trademark Remedy Clarification Act, Pub.L. 102–542, 106 Stat. 3567 (1992), which amended the Lanham Act, provides:

> As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the same provisions of this Act in the same manner and to the same extent as any nongovernmental entity.

Pub.L. No. 102–542, 106 Stat. 3567 (1992). This language is also an unequivocal expression of Congress's intent to abrogate the Eleventh Amendment. *See Chavez v. Arte Publico Press,* 59 F.3d 539, 546 (5th Cir.1995) (noting that the Lanham Act was "recently amended to express Congress's intent to abrogate State immunity from suit...."), *cert. granted and judgment vacated sub nom. Univ. of Houston v. Chavez,* —— U.S. ——, 116 S.Ct. 1667, 134 L.Ed.2d 772, *cert. denied,* —— U.S. ——, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996).

### 2. Abrogation Made Under a Proper Exercise of Authority

Because Congress clearly and unequivocally expressed its intention to abrogate Eleventh Amendment immunity both under the Patent Act and the Lanham Act, the Court must next consider whether this abrogation was done under a proper exercise of Congress's authority. As noted above, after *Seminole Tribe,* the only remaining authority for Congressional abrogation of the States' immunity is the enforcement provision of the Fourteenth Amendment. —— U.S. at ——, 116 S.Ct. at 1128.

Section 5 of the Fourteenth Amendment provides that "Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S.CONST. amend. XIV, § 5. The Thirteenth, Fourteenth and Fifteenth Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty." *City of Rome v. United States,* 446 U.S. 156, 179, 100 S.Ct. 1548, 1563, 64 L.Ed.2d 119 (1980).

The Supreme Court first considered the meaning of Section 5 in *Ex parte Virginia,* 100 U.S. (10 Otto) 339, 25 L.Ed. 676 (1879). There, the Court upheld the constitutionality of an act prohibiting the disqualification of grand or petit jurors on account of race. *Id.* at 345–46. The Court declined to read narrowly the power granted by Section 5:

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Id.*

The civil rights legislation of the 1960s again raised questions regarding the power of Congress under the Civil Rights Amendments. In *Katzenbach v. Morgan,* 384 U.S. 641, 648, 86 S.Ct. 1717, 1722, 16 L.Ed.2d 828 (1966), the Court rejected the argument that under Section 5 Congress could only prohibit acts that would violate the substantive provisions of the Fourteenth Amendment. Referring to *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819), the Court held that the inquiry into what is "appropriate legislation" under Section 5 is whether the statute "may be regarded as an enactment to enforce [the Fourteenth Amendment], whether it is 'plainly adapted to that end' and whether it is not prohibited by but is consistent with 'the letter and spirit of the constitution.'" *Id.* 384 U.S. at 651, 86 S.Ct. at 1724.

Congress has the power to enforce all the provisions of the Fourteenth Amendment, not just the Equal Protection Clause. *United States v. Price,* 383 U.S. 787, 789 & n. 2, 86 S.Ct. 1152, 1154 & n. 2, 16 L.Ed.2d 267 (1966) (noting that Section 5 empowers Congress to enforce "every right guaranteed by the Due Process Clause of the Fourteenth Amendment"); *Flores v. City of Boerne,* 73 F.3d 1352, 1358 (5th Cir.), *cert. granted,* —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 212 (1996) (same); *see also* CONG.GLOBE, 42d Cong., 1st Sess.App. at 83 (1871) ("The [F]ourteenth [A]mendment closes with the words, 'the Congress shall have power to enforce, by appropriate legislation, the provisions of this article'—the whole of it, sir; all of the provisions of the article; every section of it.") (statement of Rep. Bingham). "We reject the notion that there is any relevant hierarchy of constitutional rights within the Fourteenth Amendment." [22] *Flores,* 73 F.3d at 1358 (citing *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 628, 109 S.Ct. 2646, 2653–54, 105 L.Ed.2d 528 (1989)).

While Congress's enforcement power is broad, however, the Court in *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), pointed out that it is not unlimited:

> As broad as the congressional enforcement power is, it is not unlimited. Specifically, there are at least three limitations upon Congress' power to enforce the guarantees of the Civil War Amendments. First, Congress may not by legislation repeal other provisions of the Constitution. Second, the power granted to Congress was not intended to strip the States of their power to govern themselves or to convert our national government of enumerated powers into a central government of unrestrained authority over every inch of the whole Nation. Third, Congress may only

"enforce" the provisions of the amendments and may do so only by "appropriate legislation." Congress has no power under the enforcement sections to undercut the amendments' guarantees of personal equality and freedom from discrimination, or to undermine those protections of the Bill of Rights which we have held the Fourteenth Amendment made applicable to the States.

*Id.* at 128–29, 91 S.Ct. at 266–67 (opinion of Black, J.). *Cf. Wilson–Jones,* 99 F.3d at 209 ("It is clear to us that these three *Katzenbach* factors cannot be kept so permissive as to make them collapse into the 'rationally related' test generally used for the enforcement clauses of the other constitutional amendments.... If we were to say that an act is valid if it is rationally related to achieving equal protection of the laws, then § 5 becomes a license to Congress to pass any sort of legislation whatsoever.").

### a. Patent Act

■ Whether a statute is "appropriate legislation" for enforcing the Fourteenth Amendment is subject to a deferential standard. "Correctly viewed, [Section 5 of the Amendment] is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Katzenbach,* 384 U.S. at 651, 86 S.Ct. at 1723–24. Thus, if rights protected by the Patent Act are correctly considered "property," legislation making the states liable in federal court for violating that statute would "plainly" be "appropriate" for enforcing the Fourteenth Amendment. *See id.* The ultimate constitutional issue in this case is, therefore, whether the interests sought to be protected by the Patent Act are "property" for purposes of the Fourteenth Amendment. [23]

---

**22.** Thus, to the extent that Florida Prepaid argues that the Fourteenth Amendment must be restricted to its historical motivation, this argument must be rejected. *See Flores,* 73 F.3d at 1358. *But cf. Wilson–Jones v. Caviness,* 99 F.3d 203, 210 (6th Cir.1996) ("Examining the FLSA itself, there is no sufficiently strong logical connection between the aim of the act—to increase the wages and shorten the hours of certain em-

ployees—and central, obvious Fourteenth Amendment concerns.").

**23.** The legislative history of the Patent Act amendments states that they were enacted under the Commerce Clause, the Patent Clause and the Fourteenth Amendment. *See* S.Rep. No. 102–280, 102d Cong., 2d Sess. 7–8 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3087, 3093–94. Although such a recitation of authority may be helpful in

"That a patent is property, protected against appropriation both by individuals and by government, has long been settled." *Hartford–Empire Co. v. United States*, 323 U.S. 386, 415, 65 S.Ct. 373, 387, 89 L.Ed. 322 (1945); *Jacobs Wind Elec. Co. v. Dep't of Transp.*, 626 So.2d 1333, 1337 (Fla.1993). The common law protects patents as property rights, and patents have traditionally been classified as one form of "intellectual property." *See Markman v. Westview Instruments, Inc.*, —— U.S. ——, —— – ——, 116 S.Ct. 1384, 1390–92, 134 L.Ed.2d 577 (1996) (discussing common law of patent enforcement). Indeed, the Patent Act explicitly recognizes that patents "have the attributes of personal property." 35 U.S.C. § 261; *see also Carl Schenck, A.G. v. Nortron Corp.*, 713 F.2d 782, 786 n. 3 (Fed.Cir.1983) ("The patent right is but the right to exclude others, the very definition of 'property.' ").

In *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed.Cir.1985), for example, the plaintiffs alleged that certain procedures of the Patent and Trademark Office violated the Fifth Amendment, which, like the Fourteenth Amendment, forbids the government from depriving persons of property without due process of law. *Id.* at 596. Although the court ultimately rejected the challenge, it began by observing that the constitutional provision did apply:

> It is beyond reasonable debate that patents are property. In *Consolidated Fruit–Jar Co. v. Wright*, [94 U.S. (4 Otto) 92, 24 L.Ed. 68] (1876) the Supreme Court stated:
>
> > a patent for an invention is as much property as a patent for land. The right rests on the same foundation and is sur-

rounded and protected by the same sanctions.

*Id.* at 599.

 Furthermore, the unlicensed use of a patented invention by the United States constitutes an uncompensated taking of the patentee's property, in violation of the Fifth Amendment. *See James v. Campbell*, 104 U.S. (14 Otto) 356, 357–58, 26 L.Ed. 786 (1881) (equating invention patent with land patent for purposes of takings clause); *Genentech, Inc. v. Regents of Univ. of Cal.*, 939 F.Supp. 639, 643 (S.D.Ind.1996) ("[a] patent is a protectable property right and to permit [a] State to infringe that property right without redress for the patent owner would deprive [the] owner of property without due process of law."); *see also Hughes Aircraft Co. v. United States*, 86 F.3d 1566, 1571 (Fed.Cir.1996); *accord Jacobs Wind Elec. Co.*, 626 So.2d at 1337 (because a patent is property, the holder can assert takings and conversion claims).

Notwithstanding this precedent, Florida Prepaid raises several unpersuasive arguments why the Fourteenth Amendment cannot justify the statute challenged here. Specifically, defendant contends that: (1) the Fourteenth Amendment can only be used to remedy "insidious discrimination"; (2) the states did not relinquish immunity for patent actions by ratifying the Fourteenth Amendment; (3) the Fourteenth Amendment does not require compensation for merely negligent conduct; and (4) the Supreme Court's decision in *Seminole Tribe* forecloses reliance on the Fourteenth Amendment to abrogate state immunity under this statute. These arguments will be addressed *seriatim*.

Defendant first argues that the Fourteenth Amendment can be used only to remedy the

---

interpreting legislation, it is not required for its validity. *See F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993) (Court "never require[s] a legislature to articulate its reasons for enacting a statute"). Nor is a statute necessarily rendered invalid when Congress gratuitously recites its bases, and one or more of those bases turns out to be improper: If federal legislation can be upheld as an exercise of federal power under any provision of the Constitution, the courts are bound to uphold it. *See Usery v. Allegheny County Inst. Dist.*, 544 F.2d 148, 155 (3d Cir. 1976), *cert. denied sub nom. Allegheny County*

*Inst. Dist. v. Marshall*, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977). For the same reasons, that a statute was originally enacted under one provision of the Constitution should not foreclose relying on a different provision to enact an amendment to the statute—whether or not the amendment itself refers to that provision. *See Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 698 (1st Cir.1983) ("The omission of any ritualistic incantation of powers by the Congress is not determinative, for there is no requirement that the statute incorporate buzz words such as 'Fourteenth Amendment' or 'section 5'....").

424

kind of "insidious discrimination" against the newly-freed slaves that prompted its adoption. *See* Defendant's Patent Brief at 16; Defendant's Patent Reply Brief at 11, 16. However, the language of the Amendment reaches far beyond that original objective, and the Supreme Court has repeatedly applied it, according to its terms, outside the context of civil rights. *See, e.g., Tulsa Professional Collection Servs., Inc. v. Pope,* 485 U.S. 478, 485, 108 S.Ct. 1340, 1344–45, 99 L.Ed.2d 565 (1988) (creditor's right to notice from debtor's estate); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985) (right to continued employment); *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 798–800, 103 S.Ct. 2706, 2711–2712, 77 L.Ed.2d 180 (1983) (mortgagee's right to notice before tax sale of mortgaged realty); *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (right to continued receipt of disability benefits). Indeed, if defendant were correct that the Fourteenth Amendment must be restricted to its historical motivation, then the Amendment could be used only to prevent discrimination on the basis of race and not on any other basis, such as gender or national origin. *See Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 71–72, 21 L.Ed. 394 (1872).

Second, Florida Prepaid contends that the states could not have relinquished immunity for patent actions by ratifying the Fourteenth Amendment, because they had already surrendered "all power over patents" in ratifying Article I of the Constitution. *See* Defendant's Patent Brief at 9. Defendant misses the point. Although the states, through Article I, relinquished the power to grant patents, they did not thereby surrender their immunity against federal suit for depriving persons of property without due process of law. *See* U.S. CONST. art. I, § 8, cl. 8. This they did surrender, however, in ratifying the Fourteenth Amendment.

Third, defendant points out that patent infringement is a tort for which the patentee need not prove specific intent, whereas the Fourteenth Amendment does not require compensation for merely negligent conduct. *See* Defendant's Patent Brief at 12–14 (citing *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (rejecting prisoner's Fourteenth Amendment claim for injury caused by deputy's negligent placement of pillow)). The principal weakness of this argument is that CSB's patent infringement action does not seek compensation for a violation of the Fourteenth Amendment. The issue here is not whether the defendant committed a constitutional tort, but whether, in enacting "appropriate legislation" to enforce the Fourteenth Amendment, Congress can make the states amenable to suit in federal court for allegedly violating certain property rights. Moreover, Congress's enforcement power under Section 5 is not, in fact, limited to intentional violations, but includes actions that have only the effect (but not the intent) of violating the Fourteenth Amendment. *See Flores,* 73 F.3d at 1359–60.[24]

Finally, in an effort to avoid the conclusion that the challenged provisions of the Patent Act are valid exercises of Fourteenth Amendment power, Florida Prepaid asserts that the Supreme Court's decision in *Seminole Tribe* forecloses reliance on the Fourteenth Amendment to abrogate state immunity under this statute. Specifically, defendant (1) relies on a passage from Justice Stevens's dissenting opinion in *Seminole Tribe* and on the majority's supposed response to that passage; (2) contends that *Seminole Tribe's* overruling of a prior decision (*Union Gas*) also overruled dictum in that earlier decision; and (3) asserts that the Fourteenth Amendment does not give Congress power to abrogate state immunity for violations of the Patent Act because *Seminole Tribe* fails to say that it does.

First, Florida Prepaid attempts to deduce support from the statement of a dissenting Justice in *Seminole Tribe,* coupled with the majority's partial reaction to that statement. In an opinion in which no other Justice joined, Justice Stevens stated that the Court's decision would "prevent[ ] Congress

---

**24.** In any event, the plaintiff here alleges that defendant is infringing plaintiff's patent "willful- ly." *See* Patent Compl. ¶ 7.

from providing a federal forum for a broad range of actions against States, from those sounding in copyright and patent law, to those concerning bankruptcy, environmental law, and the regulation of our vast national economy." *Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1134 (Stevens, J., dissenting). Florida Prepaid contends that "the majority did not dispute" this statement, *see* Defendant's Patent Brief at 11, 14; indeed, relying on a footnote in the majority opinion, defendant goes so far as to say that "the majority *agreed* that the decision would prevent patent suits against the states." *Id.* at 14 (emphasis added) (citing *Seminole Tribe,* —— U.S. at —— n. 16, 116 S.Ct. at 1131 n. 16).

Nothing of the sort follows from *Seminole Tribe.* To begin with, the footnote to which defendant refers says nothing about the Patent Act: "Justice Stevens understands our opinion to prohibit federal jurisdiction over suits to enforce the bankruptcy, copyright, and antitrust laws against the States." *See Seminole Tribe,* —— U.S. at —— n. 16, 116 S.Ct. at 1131 n. 16. Furthermore, the majority's footnote does not actually respond to Justice Stevens's statement as to the effect of the Court's holding on other statutes. Rather, it only attempts to undercut the impact of Justice Stevens's contention, based partly on the fact that the statutes referred to did not expressly abrogate state immunity. *See id.* The 1992 amendments to the Patent Act, however, have removed any doubt in that regard as far as this statute is concerned. The Court's failure to respond to Justice Stevens's assertion does not, contrary to defendant's argument, manifest an "indifferen[ce] to constitutional doctrine" of the part of the majority. *See* Defendant's Patent Reply Brief at 8. Rather, the Court frequently leaves unanswered questions that are suggested by the facts but not presented for decision—including questions that dissenting and concurring opinions attempt to answer. *See, e.g., McNeal v. Culver,* 365 U.S. 109, 117, 81 S.Ct. 413, 418, 5 L.Ed.2d 445 (1961) ("The question treated in the separate concurring opinion only lurks in the record, as it was not raised, briefed or argued here, and therefore we do not reach or express any views upon it.").

Defendant also contends that *Seminole Tribe* forecloses reliance on the Fourteenth Amendment because the Court's earlier decision in *Union Gas* had observed that the Fourteenth Amendment gave Congress power to abrogate state immunity, and *Seminole Tribe* expressly overruled *Union Gas. See* Defendant's Patent Brief at 13; *see also Union Gas,* 491 U.S. at 15–16, 109 S.Ct. at 2281–2283. The passage from *Union Gas* to which defendant refers, however, merely recited a proposition that had been established by other decisions and that, particularly in light of *Seminole Tribe,* remains valid today. *See Union Gas,* 491 U.S. at 7, 109 S.Ct. at 2277–78 (citing *Atascadero State Hosp.,* 473 U.S. at 242, 105 S.Ct. at 3146–47); *see also Fitzpatrick,* 427 U.S. at 456, 96 S.Ct. at 2671. *Seminole Tribe* only overruled the holding in *Union Gas,* which was that Congress could not abrogate state immunity under the Commerce Clause. *See Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1128; *Union Gas,* 491 U.S. at 19–20, 109 S.Ct. at 2284–2285.

Finally, Florida Prepaid suggests that if the Fourteenth Amendment gave Congress power to abrogate state immunity for violations of the Patent Act, then the Supreme Court would surely have said so in *Seminole Tribe. See* Defendant's Patent Brief at 12–13. Under American jurisprudence, however, the opposite is true. There was no reason for the Court to comment on the authority for abrogating immunity under a statute that was not before the Court. *See Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1125 (petitioner did not challenge appellate court's conclusion that statute was not enacted pursuant to the Fourteenth Amendment). To do otherwise would have been to issue an advisory opinion. *See Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975) (lack of power to render advisory opinions). Accordingly, *Seminole Tribe* does not foreclose reliance on the Fourteenth Amendment.

In sum, a patent is "property" for purposes of the Fourteenth Amendment, and Congress can, under that Amendment, abrogate Eleventh Amendment immunity for claims under the Patent Act. Moreover, Congress has the power to enforce all of the

provisions of the Fourteenth Amendment, including the Due Process Clause. It necessarily follows, therefore, that Congress may, pursuant to Section 5 of the Fourteenth Amendment, enact appropriate legislation to make states amenable to suit in federal court for allegedly depriving patentees of their patent property without compensation and without due process of law. Accordingly, this Court finds that the Patent Act amendments, which abrogate the States' Eleventh Amendment immunity, are "appropriate legislation" under Section 5 of the Fourteenth Amendment. As such, defendant's motion to dismiss is denied.

### b. Lanham Act

■ The final issue before this Court is whether the interests sought to be protected by the "false advertising prong" of the Lanham Act are "property" for purposes of the Fourteenth Amendment.[25] *See Katzenbach,* 384 U.S. at 651, 86 S.Ct. at 1723–24. As a threshold matter, however, we must first determine what interests are protected by this prong of the Lanham Act.[26]

The Lanham Act was enacted "to protect persons engaged in such commerce against unfair competition." 15 U.S.C. § 1127; *see Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1382 (5th Cir.1996). Section 43(a) of the Lanham Act provides in relevant part that:

> Any person who . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities, shall be liable in a civil action by any

person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Thus, the text of the statute makes clear that the false advertising prong of Section 43(a) is "designed to protect the right of the consumer to be told the truth." (3 MCCARTHY ON TRADEMARKS § 27.04[1][b] at 27–39); *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 619 F.Supp. 1204, 1218 (D.N.J. 1985) (same); *see also Castrol, Inc. v. Pennzoil Co.,* 987 F.2d 939 (3d Cir.1993) ("Because honesty and fair play are prominent arrows in America's quiver of commercial and personal ideals, Congress enacted Section 43(a) of the Lanham Act 'to stop the kind of unfair competition that consists of lying about goods or services.'"). "That is, 'Quite clearly, the Congressional intention was to allow a private suit by a competitor to stop the kind of unfair competition that consists of lying about goods or services, when it occurs in interstate commerce.'" 3 MCCARTHY ON TRADEMARKS § 27.04[1][b] at 27–39 (citing *Skil Corp. v. Rockwell Int'l Corp.,* 375 F.Supp. 777, 784 (N.D.Ill.1974)).

Having determined that the false advertising prong of the Lanham Act essentially protects the "right to be free from false advertising," we now must ask whether this right is "property" for purposes of the Fourteenth Amendment. Clearly it is not. An interest in being free from alleged false advertising simply does not qualify as a property right for purposes of the Due Process Clause of the Fourteenth Amendment, or

**25.** The false advertising prong of the Lanham Act is separate and distinct from the trademark infringement prong. *See, e.g., Stanfield v. Osborne Indus.,* 52 F.3d 867, 873 (10th Cir.) (finding "two distinct bases of liability under [15 U.S.C.] section 1125"), *cert. denied,* —— U.S. ——, 116 S.Ct. 314, 133 L.Ed.2d 217 (1995); *Agee v. Paramount Communications, Inc.,* 853 F.Supp. 778, 790 (S.D.N.Y.1994) (noting that "[s]ection 43(a) [of the Lanham Act] provides two distinct causes of action"), *rev'd on other grounds,* 59 F.3d 317 (1995).

In the present matter, the Lanham Act claims brought against Florida Prepaid are complaints about alleged false advertising:

> This action for false advertising and unfair competition arises under the trademark laws

of the United States, 15 U.S.C. §§ 1051 et seq., and the common law of unfair competition, and concerns material misrepresentations made in connection with the advertising and promotion of the Florida Prepaid College Program.

Lanham Act Compl. ¶ 1. CSB has not asserted any claims for trademark infringement.

**26.** The legislative history of the Lanham Act amendments states that they were enacted under the Commerce Clause and the Fourteenth Amendment. *See* S.Rep. No. 102–280, 102d Cong., 2d Sess. 7–8 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3087, 3093–94.

indeed for any other purpose.[27] However laudable Congress's purpose may be, *see Coca–Cola Co. v. Procter & Gamble Co.*, 822 F.2d 28, 31 (6th Cir.1987), the false advertising prong of the Lanham Act does not implicate any of the substantive guarantees of the Fourteenth Amendment, and therefore cannot be the basis for the abrogation of Eleventh Amendment immunity.

Moreover, none of the cases cited by plaintiff, *see* CSB's Lanham Act Brief at 33–36, holds that the "right" to be free from a competitor's alleged false advertising constitutes a property right.[28] *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir.1954), did not involve simple false advertising of the type alleged here, but rather a claim that the defendant had used a picture of the plaintiff's dress in its promotions. *See id.* at 649–50. Further, the opinion of the Third Circuit said nothing about any property rights. Similarly, in *AT & T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995), the court noted, "AT & T's allegations are an amalgam of a classic section 43(a) claim alleging misuse of a mark, a claim of false advertising pursuant to 15 U.S.C. § 1125(a)(2), and a claim of passing off." *Id.* at 1428 n. 9. Again, even in the language quoted by CSB, *see* CSB's Lanham Act Brief at 34–35, the court mentioned only causes of action for unfair competition, and said nothing about "property."

Plaintiff's reference to *SK & F Co. v. Premo Pharmaceutical Lab., Inc.*, 625 F.2d 1055 (3d Cir.1980) is also unavailing. *SK & F Co.* was a trade dress case in which the defendant allegedly used the same color for its pills as the plaintiff manufacturer did. *See id.* at 1057–59. The court discussed the tort of unfair competition, but said nothing about property rights. Moreover, *International News Serv. v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), did not involve false advertising, but rather infringement so severe that it amounted to theft. The defendant was accused of "pirating" the plaintiff's news stories through illegal copying, the bribing of employees, and other nefarious means. *See id.* at 231, 39 S.Ct. at 69–70. Finally, the right of publicity, whether of a "human cannonball" or not, *see Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), has nothing to do with the instant case. Florida Prepaid is alleged to have made misleading statements about its own program, not to have misappropriated some element of plaintiff's product. Thus, *Zacchini* is also inapposite.

Finally, we are unaware of any authority suggesting that Congress may, by simple fiat, abruptly declare that a simple statutory cause of action, which traditionally has not been understood to involve any kind of property, now encompasses a "property right" to which the Fourteenth Amendment applies. Indeed, if Congress has such power, it could easily "reverse" the outcome in *Seminole Tribe* by inserting into some staff report a reference regarding the importance of using the Fourteenth Amendment to protect the "right" to have a state negotiate over a gaming compact. To quote Justice Scalia, "If state sovereign immunity has any reality, it must mean more than this." *Union Gas*, 491 U.S. at 44, 109 S.Ct. at 2304 (concurring in part and dissenting in part).

We conclude by reiterating that this case does not involve property that Congress may protect under the Fourteenth Amendment. Congress has no power, under the Fourteenth Amendment or any other provision of the Constitution, to strip the states of their Eleventh Amendment immunity and subject them to suits in federal court for false advertising. Accordingly, the Trademark Remedy Clarification Act is unconstitutional as applied in this case, and plaintiff's Lanham Act Claim must be dismissed for lack of subject matter jurisdiction. Furthermore, because

---

27. We have uncovered no precedent, federal or state, even discussing whether the right to be free of unfair competition is "property."

28. General discussions of "the Lanham Act" or "unfair competition" are insufficient. This case involves only a claim for false advertising by a competitor, not the other varieties of Lanham Act infringement claims or unfair competition claims that plaintiff's cases consider.

there has been no suggestion that Florida Prepaid's Eleventh Amendment immunity has been—or could be—stripped with respect to CSB's common law unfair competition claim, this claim must also fail and plaintiff's Lanham Act Complaint is dismissed in its entirety.

## III. CONCLUSION

For the foregoing reasons, the Court will: (1) deny defendant's motion to dismiss plaintiff's Patent Act Claim; (2) grant defendant's motion to dismiss plaintiff's Lanham Act Claim; and (3) dismiss plaintiff's Lanham Act Complaint in its entirety. An appropriate Order is filed herewith.

### ORDER

For the reasons set forth in this Court's Memorandum Opinion,

IT IS this 13th day of December, 1996

ORDERED that defendant's motion to dismiss plaintiff's Patent Act Claim (Civ. No. 94–5610) pursuant to FED.R.CIV.P. 12(h)(3) be and is hereby DENIED; and it is further

ORDERED that defendant's motion to dismiss plaintiff's Lanham Act Claim (Civ. No. 95–4516) be and is hereby GRANTED; and it is further

ORDERED that plaintiff's Lanham Act Complaint (Civ. No. 95–4516) be and is hereby DISMISSED in its ENTIRETY.